## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

COMMON CAUSE; LEAGUE OF
WOMEN VOTERS OF GEORGIA;
DR. URSULA THOMAS; JASMINE
BOWLES; DR. H. BENJAMIN
WILLIAMS,

*Plaintiffs*,

v.

BRAD RAFFENSPERGER, in his
official capacity as Secretary of State
of Georgia; JOHN KENNEDY, in his
official capacity as Chair of the
Georgia Senate Committee on
Reapportionment and Redistricting;
BONNIE RICH, in her official capacity
as Chair of the Georgia House
Committee on Legislative and
Congressional Reapportionment,

*Defendants*.

Case No. _____

**COMPLAINT FOR
DECLARATORY JUDGMENT
AND INJUNCTIVE RELIEF**

**THREE-JUDGE PANEL
REQUESTED**

## INTRODUCTION

1.      Faced with the reality that Georgia's Black, Indigenous, and people of color ("BIPOC") population (48.1%) is on the verge of outnumbering its non-Hispanic white population (51.9%), the General Assembly subordinated traditional districting principles, including compactness and respect for maintaining whole counties and communities of actual shared interest, to racial considerations in drawing the boundaries of Congressional Districts 6, 13, and 14 (the "Challenged Districts") in its newly enacted redistricting plan, S.B. 2EX.

2.     The General Assembly employed the enduring racial gerrymandering tactics of "packing" and "cracking" to reduce the voting strength of Georgia's Black voters and other voters of color.  "Packing" involves concentrating Black voters and other voters of color into one district to reduce their voting strength in other districts, while "cracking" is executed by spreading the remaining Black voters and other voters of color among multiple districts, keeping their numbers below those necessary to elect their candidates of choice.  The goal and effect of these unlawful tactics is to maintain the voting power of white voters, with the consequence that Black voters and other voters of color are unable to elect their candidates of choice.

3.     The General Assembly packed District 13 by piecing together portions of six counties to create a sprawling district with a voting age-population that is 66.7% Black and 81.2% BIPOC; cracked District 6 by removing communities of color and eliminating the opportunity for Black voters and other voters of color to continue to elect their preferred candidate, a Black woman; and cracked District 14 by moving Black communities from part of a core Metropolitan Atlanta county into a predominately white, rural district whose communities do not share their interests, and where Black voters will not be able to elect their preferred candidates.

4.     The General Assembly's maps are the latest manifestation of Georgia's legacy of having one of the country's worst records of discrimination in voting.  Prior to 2013, the State of Georgia could not enact any redistricting plan or change any

other voting-related rule or process without first obtaining a determination from the United States Department of Justice or a federal court in Washington, D.C. that the plan, rule, or process had neither a discriminatory purpose nor discriminatory effect. Georgia regularly failed to receive this approval.

5.   In the absence of the preclearance requirement, the General Assembly has passed racially discriminatory restrictions on absentee voting, early voting, and in-person voting on election day, and authorized well-known intimidation tactics, including increasing opportunities for voter eligibility challenges and creating new crimes for assisting eligible voters.  S.B. 2EX is the first congressional redistricting plan passed by the General Assembly since the preclearance requirement was removed.

6.   The General Assembly's racially gerrymandered maps are its latest assault on the rights of Black voters and other voters of color to participate meaningfully in the democratic process and elect candidates of their choice.  The General Assembly's use of race as the predominant factor in the Challenged Districts' boundaries was not narrowly tailored to comply with Section 2 of the Voting Rights Act of 1965 ("VRA") or advance any other compelling governmental interest.  As a result, Districts 6, 13, and 14 violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and must be enjoined.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction to hear this case under 28 U.S.C. §§ 1331, 1343, and 1357 because the matters in controversy arise under the Constitution and laws of the United States, as well as under 42 U.S.C. §§ 1983 and 1988.

8.     The Court has jurisdiction to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202.

9.     The Court has personal jurisdiction over the Defendants, who are all citizens and residents of Georgia and elected officials of the State of Georgia (the "State") sued in their official capacities.

10.     A three-judge panel is requested pursuant to 28 U.S.C. § 2284(a), as this action challenges "the constitutionality of the apportionment of congressional districts."

11.     Venue is proper under 28 U.S.C. § 1391(b).

## PARTIES

12.     Plaintiff Common Cause is a non-profit corporation and nonpartisan democracy group.  Since its founding by John Gardner in 1970, Common Cause has been dedicated to fair elections and making government at all levels more representative, open, and responsive to the interests of all people.  "For the past twenty-five years, Common Cause has been one of the leading proponents of redistricting reform."  Jonathan Winburn, *The Realities of Redistricting: Following*

*the Rules and Limiting Gerrymandering in State Legislative Redistricting* 205 (2009).

13.    Common Cause carries out its mission in Georgia through Common Cause Georgia, whose offices are located in Atlanta, Georgia, and who conducts activities and has members and supporters across the state.  In Georgia, Common Cause works to "strengthen public participation in our democracy and ensure that public officials and public institutions are accountable and responsive to citizens." Common Cause Georgia, https://www.commoncause.org/georgia/.  Common Cause assists voters, including those in Georgia, in navigating the elections process, provides resources for voters to determine their districts and their polling locations, and mobilizes voters to engage in political advocacy.

14.    Unfair and discriminatory redistricting directly frustrates and impedes Common Cause's core missions of making government more responsive to the interests of communities by diminishing the voices of the voters Common Cause works to engage, and forces Common Cause to divert resources toward directly combatting the ill effects of unlawful redistricting.

15.    Common Cause has more than 26,000 members and supporters across Georgia, including members in each of the Challenged Districts.  Common Cause has members who are registered voters who reside in each of the Challenged Districts and who identify as Black and/or other people of color.  If the Challenged

5

Districts are not enjoined, these members will be harmed by living and voting in unconstitutionally racially gerrymandered districts.

16.     Common Cause brings this action on its own behalf and on behalf of its members and supporters who are residents of and registered voters in the Challenged Districts, who each have a right to representation in the U.S. Congress that complies with the U.S. Constitution.

17.     Plaintiff League of Women Voters of Georgia (the "League") is a non-profit corporation and nonpartisan democracy group organized and existing under the laws of the State of Georgia.  The League fights to protect the rights of eligible voters and expand access for those who have been left out of the democratic process. As part of its mission, the League assists voters in navigating the elections process, provides resources for voters to determine their districts and their polling locations, and mobilizes voters to engage in political advocacy.  The League provides public education materials to voters on the redistricting process and advocates for fair and constitutional maps.

18.     Unfair and discriminatory redistricting directly frustrates and impedes the League's core missions of protecting the rights of voters the League works to engage, and forces the League to divert resources toward directly combatting the ill effects of unlawful redistricting.

19.     The League has eight local, county-based chapters and five at-large chapters in Georgia.  These include the League of Women Voters of Marietta-Cobb County, the League of Women Voters of Atlanta-Fulton County, and the League of Women Voters of Rome-Floyd County, which are based in the Challenged Districts.

20.     The League has members in each of the Challenged Districts.  The League has members who are registered voters who reside in each of the Challenged Districts and who identify as Black and/or other people of color.  If the Challenged Districts are not enjoined, these members will be harmed by living and voting in unconstitutionally racially gerrymandered districts.

21.     The League brings this action on its own behalf and on behalf of its chapters, members, and supporters who are residents of and registered voters in the Challenged Districts, who each have a right to representation in the U.S. Congress that complies with the U.S. Constitution.

22.     Plaintiff Dr. Ursula Thomas is a registered voter and resident of Austell, Georgia, Cobb County, in Congressional District 13.  Dr. Thomas identifies as Black/African-American.  She is and will continue to be irreparably harmed by living and voting in an unconstitutionally racially gerrymandered district.

23.     Plaintiff Jasmine Bowles is a registered voter and resident of Fayetteville, Georgia, Clayton County, in Congressional District 13.  Ms. Bowles

identifies as Black/African-American.  She is and will continue to be irreparably harmed by living and voting in an unconstitutionally racially gerrymandered district.

24.     Plaintiff Dr. H. Benjamin Williams is a registered voter and resident of Mableton, Georgia, Cobb County, in Congressional District 13.  Dr. Williams identifies as Black/African-American.  He is and will continue to be irreparably harmed by living and voting in an unconstitutionally racially gerrymandered district.

25.     Defendant Brad Raffensperger is sued in his official capacity as the Secretary of State of Georgia.  Defendant Raffensperger is Georgia's chief election officer, responsible for overseeing the conduct of its elections and implementing election laws and regulations, including the congressional districts map at issue in this litigation.  *See* Ga. Code Ann. § 21-2-50(b); Ga. Comp. R. & Regs. 590-1-1-.01, .02 (2018).

26.     Defendants John Kennedy and Bonnie Rich are sued in their official capacities as Chairs of the Georgia Senate Committee on Reapportionment and Redistricting ("Senate Committee") and Georgia House Committee on Legislative and Congressional Reapportionment ("House Committee"), respectively.  In their capacity as Chairs of the Senate Committee and House Committee, Defendants Kennedy and Rich prepare and develop redistricting plans for the State and preside over the meetings of their respective committees.  Defendants Kennedy and Rich led

the drawing of the Challenged Districts and will likely lead efforts to redraw districts to remedy their unconstitutionality if the Court orders the State to do so.

## STATEMENT OF FACTS

27.     On November 22, 2021, Georgia's General Assembly passed S.B. 2EX, the congressional redistricting plan developed by Defendants Kennedy and Rich and favorably reported out of their respective legislative committees.   S.B. 2EX establishes Georgia's congressional districts for the upcoming ten-year cycle, starting with the 2022 congressional elections.   Georgia's Governor, Brian Kemp, signed S.B. 2EX into law on December 30, 2021.

28.     S.B. 2EX continues Georgia's long history of racially discriminatory voting practices.   The revisions are a disheartening confirmation that "a leopard cannot change its spots," Jeremiah 13:23 (KJV), and a stern reminder of the need for vigilance to protect minority rights.

## I.    Georgia's Long History of Suppressing the Voting Strength of Black Voters and Other Voters of Color

29.     For many decades, Georgia and its white elected officials have worked relentlessly to suppress the vote and voting power of Black voters and other voters of color.  Black voters and other voters of color have tirelessly challenged Georgia's efforts, asking the federal courts to help them rebuff race-based assaults on the right to vote.  And time and again, the federal courts have answered the call, documenting Georgia's shameful history of racially discriminatory voting practices.  *See, e.g.*,

*Brooks v. State Bd. of Elections*, 848 F. Supp. 1548, 1560 (S.D. Ga. 1994) ("The history of the state['s] segregation practice and laws at all levels has been rehashed so many times that the Court can all but take judicial notice thereof."); *Johnson v. Miller*, 864 F. Supp. 1354, 1379–80 (S.D. Ga. 1994), *aff'd and remanded*, 515 U.S. 900 (1995) ("[W]e have given formal judicial notice of the State's past discrimination in voting, and have acknowledged it in the recent cases."); *Ga. State Conf. of the NAACP v. Fayette Cnty. Bd. of Comm'rs*, 950 F. Supp. 2d 1294, 1314 (N.D. Ga. 2013), *aff'd in part, vacated in part*, *rev'd in part and remanded*, 775 F.3d 1336 (11th Cir. 2015) ("Generally, Georgia has a history chock full of racial discrimination at all levels.  This discrimination was ratified into state constitutions, enacted into state statutes, and promulgated in state policy.  Racism and race discrimination were apparent and conspicuous realities, the norm rather than the exception.") (quoting *Brooks*, 848 F. Supp. at 1560).

30.    In the years after the Civil War, the euphoria of Emancipation was quickly replaced by the Ku Klux Klan's terror.  The Equal Justice Initiative has documented 589 known lynchings in Georgia from 1877 until 1950, the second highest total among states.  Lynching and other racial violence against Black Georgians created an environment of fear that deterred eligible Black voters from voting.

31.     Racial violence went hand-in-hand with governmental repression that was nakedly effective in disenfranchising Black voters through a variety of election laws, including grandfather clauses, literacy tests, poll taxes, and the adoption of "white primaries."

32.     In 1877 Georgia was the first state to enact a "poll tax," which disenfranchised many poor Black voters for 75 years until it was abolished in 1945.

33.     The Democratic Party in Georgia adopted "white primaries," allowing only white voters to vote in primaries, in 1900.  This practice continued in Georgia until it was held unconstitutional 45 years later in *King v. Chapman*, 62 F. Supp. 639, 650 (M.D. Ga. 1945), *aff'd*, 154 F.2d 460 (5th Cir. 1946).

34.     In 1958, Georgia adopted "literacy tests" for voting that had a disproportionate impact on Black voters.  The use of these tests in Terrell County, Georgia, was challenged under the Civil Rights Act of 1957, and found to have subjected Black voters to "distinctions in the registration process on the basis of their race and color."  *United States v. Raines*, 189 F. Supp. 121, 132 (M.D. Ga. 1960).

35.     In 1961, the U.S. Commission on Civil Rights reported that in many rural counties of Georgia there was "total exclusion from the suffrage" for Black voters.  The report concluded that "[t]he right to vote without distinctions of race or color—the promise of the 15th amendment—continues to suffer abridgment," and that there was evidence of "discriminatory disenfranchisement" in Georgia.

36.     When Congress enacted the VRA in 1965, Georgia was one of the nine states required to get clearance from the Department of Justice before changing election rules, because of the State's history of voter discrimination.  *See South Carolina v. Katzenbach*, 383 U.S. 301, 329-30 (1966) ("Section 4(b) of the Act also embraces [Georgia]" due to "evidence of actual voting discrimination.").

37.     From 1965 to 2012, Georgia's racially discriminatory voting schemes necessitated federal intervention 187 times, including more than 91 Department of Justice Section 5 objections since the 1982 reauthorization of Section 5 of the VRA.

38.     In 2013, the Supreme Court in *Shelby County v. Holder*, 570 U.S. 529 (2013), invalidated the coverage provision that determined which jurisdictions were subject to the VRA's preclearance requirement.  Since then, unfettered by preclearance restrictions, Georgia has regularly sought to suppress the vote of people of color, and Black voters in particular.

39.     After *Shelby County*, Georgia lawmakers have sought to curtail the voting rights of Black voters at every stage of the process, implementing a broad array of barriers that disproportionately impact voters of color, including:

      a.     Shortening voter registration deadlines;

      b.     Aggressive "exact match" rejection of voter registration deadlines;

      c.     Voter registration purges;

      d.     Voter eligibility challenges;

      e.     Criminal investigations of voter registration drives;

      f.     Restricting early voting; and

      g.     Closing polling places, with consequent long lines to vote.

40.    Black voters and other voters of color bear the effects of discrimination in areas such as education, employment, and housing.  Black Georgians live with higher poverty rates as compared to white Georgians, have lower incomes per capita, have lower levels of educational attainment, and have lower home ownership rates according to the U.S. Census Bureau's 2019 American Community Survey.

## II. Georgia's Use of Congressional Redistricting to Discriminate Against Black Voters and Other Voters of Color

41.    Georgia's long tradition of various efforts to suppress the right of Black citizens to vote is especially apparent in Georgia's periodic congressional redistricting.  Historically, Georgia's redistricting plans have been marred by their deleterious effects on people of color, particularly African-American communities.

42.    In the first redistricting cycle after the passage of the Voting Rights Act of 1965, the U.S. Department of Justice objected to the congressional redistricting plan under Section 5 of the VRA's preclearance provisions based on its inability to conclude "that [the] new boundaries [would] not have a discriminatory racial effect on voting by minimizing or diluting black voting strength in the Atlanta area."  *See* Letter from David L. Norman, Assistant Attorney General, U.S. Department of

Justice, Civil Rights Division, to the Hon. Arthur K. Bolton, Attorney General, State of Georgia (Feb. 11, 1972), https://www.justice.gov/crt/records/vot/obj_letters/letters/GA/GA-1140.pdf.

43.     During the next redistricting cycle, the Department of Justice denied preclearance to Georgia's 1981 congressional redistricting plan.  *See* Letter from William Bradford Reynolds, Assistant Attorney General, U.S. Department of Justice, Civil Rights Division, to the Hon. Michael Bowers, Attorney General, State of Georgia (Feb. 11, 1982), https://www.justice.gov/crt/records/vot/obj_letters/letters/GA/GA-1870.pdf.   The State then sought a declaratory judgment from a three-judge federal court in Washington, D.C. that the plan had neither the purpose nor effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group.  To the contrary, the court found: "The only reason the Georgia General Assembly failed to enlarge the black population in the Fifth District more than it did and failed to unite black neighborhoods was solely because the population was of the black race.  There was no legitimate, nondiscriminatory reason why the Fifth District was drawn the way it was. . . .  The Fifth District was drawn to suppress black voting strength in Georgia."  *Busbee v. Smith*, 549 F. Supp. 494, 514-15 (D.D.C. 1982), *aff'd mem*., 459 U.S. 1166 (1983).

14

44.     In weighing the evidence presented, the court found Joe Mack Wilson—then Chairman of the House Reapportionment Committee—"is a racist," who told his colleagues on numerous occasions that "I don't want to draw n***** districts." *Id.* at 500-01.

45.     In the same opinion, the federal court found that Tom Murphy, the Speaker of the House, "refused to appoint black persons to the conference committee [to resolve the dispute between the House and Senate] solely because they might support a plan which would allow black voters, in one district, an opportunity to elect a candidate of their choice." *Id.* at 510.

46.     The Department of Justice twice denied Section 5 preclearance to Georgia's congressional redistricting plans in 1992.  The first proposed plan "d[id] not recognize the black voting potential of the large concentration of minorities in southwest Georgia," and the State did not "satisfactorily explain[]" why the 5th District included predominately white precincts while excluding adjacent Black communities which had a community of interest with the residents of the 5th District. *See* Letter from John R. Dunne, Assistant Attorney General, U.S. Department of Justice, Civil Rights Division, to Mark H. Cohen, Senior Assistant Attorney General, State of Georgia (Jan. 21, 1992), https://www.justice.gov/crt/records/vot/obj_letters/letters/GA/GA-2330.pdf.  The second proposed plan was rejected due to "continu[ing]" "concerns that the Georgia

legislative leadership had been predisposed to limit black voting potential to two black majority voting age population districts," and a finding that "the submitted plan minimizes the electoral potential of large concentrations of black population in several areas of the state." Letter from John R. Dunne, Assistant Attorney General, U.S. Department of Justice, Civil Rights Division, to Mark H. Cohen, Senior Assistant Attorney General, State of Georgia (Mar. 20, 1992), https://www.justice.gov/crt/records/vot/obj_letters/letters/GA/GA-2360.pdf.

47.    Georgia's 2011 congressional redistricting plan passed despite the opposition of 40 out of 41 Black representatives in the House of Representatives, and the opposition of all Black senators in the Senate. *See* H.B. 20EX, Georgia Congressional Reapportionment Act of 2011, https://www.legis.ga.gov/legislation/34771.

48.    Black Congressman and civil rights icon, John Lewis, described the 2011 congressional redistricting plan as "an affront to the spirit and the letter of the Voting Rights Act." Aaron G. Sheinin, *GOP Redistricting Plan Would Tighten Grip on Congressional Delegation*, Atlanta Journal-Constitution (Aug. 23, 2011), http://www.ajc.com/news/local-govt--politics/gop-redistricting-plan-would-tighten-grip-congressional-delegation/7pf5U0xghjknRgzQUW7O8O/.

49.    In the nearly five decades that the Department of Justice required Georgia's redistricting plans to be precleared under Section 5 of the VRA, the

Department of Justice objected to 30 congressional, state legislative, and local redistricting schemes. The Department of Justice prevailed on 28 of the objections, with a court denying declaratory judgment in one and the Department of Justice withdrawing one other.

50.    S.B. 2EX is the State's first congressional redistricting plan to be enacted since the end of the VRA's preclearance requirement that applied for the last five redistricting cycles.

### III.  The 2021 Legislative Process for Redistricting

51.    The rushed legislative process for redrawing Georgia's congressional maps was marked by a distinct lack of transparency and accountability. The congressional map that ultimately became law as S.B. 2EX was released publicly for the first time on November 17, 2021, and was passed by the General Assembly three business days later, on November 22, 2021.

52.    At each juncture, the General Assembly ignored the input of Georgia residents, including Georgians' concerns that congressional districts proposed in S.B. 2EX violated traditional redistricting criteria and reduced the voting strength of people of color through the use of "cracking" and "packing" maneuvers indicative of racial gerrymandering.

A.   **Changing Demographics and Growing Political Strength of the BIPOC Electorate**

53.     On August 12, 2021, the U.S. Census Bureau released the results of the 2020 Census.   Georgia's population grew by 10.6% between 2010 and 2020. Communities of color drove this population growth, with the Black population growing by 15.8%, the Latinx population by 31.6%, and the Asian American population by 54.8%.[1]  By contrast, the white population shrank by 4.0% over that same time period.  51.9% of Georgia's current population identifies as non-Hispanic white, 33.0% as Black, 10.5% as Latinx, 5.3% as Asian American, and 2.0% as any part American Indian/Alaska Native.

54.     Georgia's shifting demographics have corresponded to increased political strength for Black voters and other voters of color, especially in recent elections.  2018 gubernatorial candidate Stacey Abrams, a Black woman who was the Black-preferred candidate, was narrowly defeated after receiving 48.8% of the general election vote.   Reverend Raphael Warnock and Jon Ossoff—the Black-preferred candidates in the January 2021 United States Senate runoff elections— prevailed, receiving 51% and 50.6% of the vote, respectively.   Members of the

---

[1] We use "Black" to refer to any Census respondent who replied they were any part Black, "Latinx" to refer to any Census respondent who replied they were of Hispanic or Latino origin, and "Asian American" to refer to any Census respondent who replied they were any part Asian.

Georgia General Assembly, including those managing the 2021 legislative redistricting process, are aware of these demographic and electoral trends and were aware of these demographic and electoral trends throughout the 2021 legislative redistricting process.

### B.   Redistricting Town Halls and Online Portal: June-August 2021

55.    The redistricting process was managed in the Georgia House of Representatives by the House Committee, led by Defendant Rich.  The redistricting process was managed in the Georgia Senate by the Senate Committee, led by Defendant Kennedy.

56.    The General Assembly's Legislative and Congressional Reapportionment Office (the "Reapportionment Office") is a joint office of the Georgia House and Senate.  The Reapportionment Office provides General Assembly members and committees with redistricting services, including technical assistance, maps, and data reports.

57.    Between June 15, 2021 and August 11, 2021, the House Committee and Senate Committee (collectively, the "Redistricting Committees" or "Committees") held a series of town hall meetings across the state where the Redistricting Committees solicited public comment about the redistricting process.  None of these meetings were held in three of Georgia's most populous counties (DeKalb, Cobb,

and Gwinnett), all of which have high numbers of Black voters and other voters of color.

58.    Moreover, all redistricting town hall meetings during this period took place prior to the introduction of any redistricting plans by the General Assembly and prior to the August 12, 2021 release of the U.S. Census data by the U.S. Census Bureau.  The public was therefore unable to provide comment on any redistricting plans by the General Assembly or provide comments that were informed by the data to be used in the final redistricting plans.

59.    Members of the public, including Common Cause, the League, and voters of color, made repeated requests during these town halls and through an online portal soliciting written comments that the Redistricting Committees provide for additional town halls and opportunities for public input following the release of U.S. Census data.  The Redistricting Committees did not provide such additional town halls and public input opportunities.

60.    Members of the public, including Common Cause, the League, and voters of color, made repeated requests during these town halls and through an online portal soliciting written comments that the Redistricting Committees provide accommodations for persons with limited English proficiency and/or persons with disabilities.  No response or action was taken by the Redistricting Committees. Members of the public, including Common Cause, the League, and voters of color,

made repeated requests during these town halls and through an online portal soliciting written comments that the Redistricting Committees provide a transparent, fair, and equitable redistricting process, raising concerns about how the redistricting process would be conducted, when and how redistricting plans would be released to the public, and whether and how the General Assembly would consider alternative maps proposed by the public.  The Redistricting Committees did not respond to these concerns.

61.    On August 30, 2021, the House Committee and Senate Committee respectively adopted guidelines for the 2021 redistricting process.  These guidelines did not respond to the public's concerns regarding accessibility for persons with limited English proficiency and/or persons with disabilities nor did they respond to other concerns regarding timing and transparency.

### C.    Events Related to Congressional Districts Between Summer Town Halls and the Special Legislative Session: September-October 2021

62.    On September 23, 2021, Governor Kemp signed a proclamation ordering the commencement of a special legislative session ("Special Legislative Session") of the Georgia General Assembly on November 3, 2021 for the purpose of drawing new redistricting maps for Georgia's House, Senate and congressional districts, among other things.  *See* A Proclamation Convening the General Assembly of Georgia in Special Session (Sept. 23, 2021), https://gov.georgia.gov/executive-action/proclamations.

63.   On September 27, 2021, the Reapportionment Office released a congressional redistricting plan ("September 27 Redistricting Plan") submitted by Sen. Kennedy.   Draft  –  Georgia  Congressional  Districts, https://www.legis.ga.gov/api/document/docs/default-source/reapportionment-document-library/cong-s18-p1-packet.pdf?sfvrsn=dd7b16e7_2.   Aside from the map, data, and shapefiles posted on the Reapportionment Office website, the September 27 Redistricting Plan was not accompanied by information explaining any rationale about how or why the plan was drawn as it was.   No town halls soliciting public input were ever held to discuss this plan.   No legislative hearings were ever held during the Special Legislative Session to discuss the September 27 Redistricting Plan.

64.   On October 21, 2021, the Reapportionment Office posted a congressional redistricting plan submitted by the Georgia House and Senate Democratic Caucuses identified as H.B. 5EX.   No town halls soliciting public input were ever held to discuss H.B. 5EX.[2]

---

[2] The House and Senate Democratic Caucus released identical versions of a proposed map in their respective chambers. For simplicity, we refer to both the House and Senate versions as H.B. 5EX.

### D. Special Legislative Session: November 2021

65.    The  General  Assembly  considered  Georgia's  congressional redistricting plans on five days during the Special Legislative Session, including all Redistricting Committees hearings, public testimony, and floor votes.

66.    Public  participation  regarding  the  congressional  redistricting  plans considered by the General Assembly during the Special Legislative Session was limited.  Some of the Georgia residents who were able to speak at the committee hearings testified that they had not been given enough time to review the proposed map that had been released only a few hours earlier.

67.    Although  the  Special  Legislative  Session  commenced  November  3, 2021,  neither  the  House  Committee  nor  Senate  Committee  considered  a congressional redistricting plan until November 17, 2021.  On that same date, the Reapportionment  Office  released  for  the  first  time  S.B.  2EX,  a  congressional redistricting plan sponsored by Sen. Kennedy and Rep. Rich.  S.B. 2EX is a different congressional  redistricting  plan  than  the  previously  released  September  27 Redistricting Plan sponsored by Sen. Kennedy.

68.    Although the Reapportionment Office released S.B. 2EX to the public just hours prior to the scheduled House Committee and Senate Committee hearings,

both Redistricting Committees nevertheless considered S.B. 2EX[3] during the scheduled hearing time.  In that same meeting, the House Committee also considered H.B. 5EX, the plan previously released on October 21, 2021 and sponsored by the House and Senate Democratic Caucuses.

69.    In discussing S.B. 2EX's proposed District 6 on November 17, 2021, Rep. Rich explained that District 6's boundaries were changed in order to keep communities of interest together.  However, during public testimony in that day's Senate Committee hearing, Johns Creek resident Maggie Goldman challenged this premise, noting S.B. 2EX's proposed District 6 would instead split communities of interest between Districts 6 and 7 and force a highly urban district in North Fulton County together with the more rural areas in Forsyth, Dawson, and Cherokee counties.  *See*, *e.g.*, Georgia Senate, *Senate Committee on Reapportionment and Redistricting*, at 13:34-15:32 (Nov. 17, 2021), https://www.youtube.com/watch?v=ShHjireJAuU.  Cindy Battles from the Georgia Coalition for the People's Agenda also warned that proposed District 6 increased the percentage of white voters in the district and would reduce the voting strength of voters of color in a district that had been electing over multiple elections the

---

[3] The House Committee considered H.B. 2EX, which is an identical version of S.B. 2EX as released by the Reapportionment Office.  For simplicity, we refer to both House and Senate versions as S.B. 2EX.

candidate preferred by voters of color.  *Id.* at 16:55-19:00.  Other members of the public testifying before the Redistricting Committees raised similar concerns.

70.     During the November 17, 2021 House Committee hearing, Rep. Rich explained that District 13 was "another Voting Rights Act-protected district" and justified the changing of the district's boundaries based on population growth. Georgia House, *House Committee on Legislative and Congressional Reapportionment*, at 63:20-63:42 (Nov. 17, 2021), https://www.youtube.com/watch?v=H46q8HKzulU.  In discussing the same district as drawn in H.B. 5EX, Rep. James Beverly noted that H.B. 5EX was drawn with less county splitting in Henry County and Clayton County as compared to S.B. 2EX, while remaining a majority-Black district in ostensible compliance with the VRA. *Id.* at 48:04-48:40.

71.     In discussing S.B. 2EX's proposed District 14 during their respective hearings on November 17, 2021, Rep. Rich and Sen. Kennedy explained that District 14's boundaries were extended to the south and east for population growth reasons.

72.     On November 18, 2021, the Senate Committee held a hearing to consider S.B. 2EX and also considered H.B. 5EX.  During this hearing, Sen. Michael Rhett raised concerns about the S.B. 2EX proposed District 14's incorporating of a heavily populated minority area in Cobb County.

73.     In the corresponding House Committee hearing considering  S.B. 2EX and H.B. 5EX for a second day, on November 18, 2021, Rep. Erica Thomas, who represents Austell and Powder Springs in the Georgia House of Representatives, similarly decried the cracking of Black communities and other communities of color: "I've had a number of constituents reach out to me about this [S.B. 2EX] map, and it is very disheartening because, with this proposed congressional district map, the citizens of Austell and Powder Springs would currently be in Congressional District 14, which is Marjorie Taylor Greene['s district].  This is not what the citizens of my district deserve.  No matter how Austell voters vote, even if 100% of them come out to vote, they will never get the representation that they vote for.  They have been paired with a district that does not look like them, or share [their] values. . . .  Why was Cobb County split to add a large population of people of color to Congressional District 14?   What [are]  the  redistricting  criteria  that  justif[y]  this  sort  of  split? Because if the answer is that the principle of one-person, one-vote, then why not draw from counties that are more demographically similar, and would lead to a more compact district, such as Fannin, Gilmer, Pickens, or Bartow counties?  Why split and dilute the voting power of people of color in West Cobb, and put them in a district that is so clearly where they don't belong?"   Georgia House, *House Committee on Legislative and Congressional Reapportionment*, at 1:50-4:02 (Nov. 18, 2021), https://www.youtube.com/watch?v=PYgjQ1ftkOU.

74.    Residents of Cobb County also expressed significant concerns about the new district boundaries during the November 18th hearing.  Cobb County resident Leroy Hutchens explained that "we are an urban Metro Atlanta area . . . but the current map [District 14 in S.B. 2EX] . . . would be more focused on agriculture . . . we are going to need representation that mirrors what we are trying to do to move forward."  *Id.* at 27:33-30:26. Cobb County resident Valerie Testament conveyed a similar concern: "Look at our community, the Powder Springs and Austell area . . . and then let's look at whether or not our interests are going to be served well within [District 14] by whomever that representative is."  *Id.* at 59:47-68:22.

75.    Despite concerns from the public and fellow legislators regarding Districts 6, 13, and 14, the Senate Committee summarily voted on and passed S.B. 2EX out of committee on November 18, 2021.  The Senate passed S.B. 2EX the next day, November 19, 2021.

76.    The following day, Saturday, November 20, 2021, at a hearing scheduled for 9:00 a.m., the House Committee voted on and passed S.B. 2EX out of committee.  S.B. 2EX passed a House floor vote the following Monday, November 22, 2021.

77.    Governor Kemp signed S.B. 2EX into law on December 30, 2021.

78.    Defendant Kennedy attempted to justify the rushed redistricting process by blaming COVID-19.  Jeff Amy, *Rules Don't Require Advance Look at Georgia*

*Legislative Maps*, U.S. News and World Report (Aug. 30, 2021), https://www.usnews.com/news/best-states/georgia/articles/2021-08-30/rules-dont-require-advance-look-at-georgia-legislative-maps.  But even with the delays in the release of U.S. Census data caused by COVID-19, Defendants Kennedy and Rich had ample time to deliberate and allow public comment on the proposed congressional map.  After the Senate and House passed S.B. 2EX on November 19 and 22, respectively, the bill sat on Governor Kemp's desk for almost 40 days.

## IV.  Redistricting Criteria

79.   Georgia law provides: "The General Assembly shall by general law divide the state into 14 congressional districts.  There shall be elected one representative to the Congress of the United States from each such district by the electors of such district."  O.C.G.A. § 21-1-2.

80.   The Redistricting Committees each adopted an identical list of nine "General Principles for Drafting Plans":

  a.  Exact equality of population (plus or minus one person) for congressional districts;

  b.  Substantial equality of population for state legislative districts;

  c.  Compliance with Section 2 of the VRA, as amended;

  d.  Compliance with the United States and Georgia constitutions;

e.  Contiguity, defined to exclude districts that connect only a single point;

f.  No multi-member districts;

g.  That "[t]he Committee should consider" county and precinct boundaries, compactness, and communities of interest;

h.  That the committee should make efforts to "avoid the unnecessary pairing of incumbents"; and

i.  That "[t]he identifying of these criteria is not intended to limit the consideration of any other principles or factors that the Committee deems appropriate."

## V.  Congressional Districts 6, 13, and 14 are Racially Gerrymandered

81.    The Challenged Districts reflect the use of race as the predominant factor, packing Black voters in a manner not justified by the VRA or cracking communities to prevent voters of color from electing candidates of choice.

### A.  Congressional District 6

82.    Race was the predominant factor in drawing Congressional District 6. The General Assembly subordinated traditional race-neutral districting principles, including compactness, respect for maintaining whole counties and communities of actual shared interest, and preserving the core of the existing district, to racial considerations.   Under S.B. 2EX, sweeping changes to District 6's boundaries

invariably removed Black voters and other voters of color who resided within the prior district boundaries, replacing them with non-Hispanic white voters who had voted in neighboring districts.

83.    In 2018 and 2020, Black voters and other voters of color elected their candidate of choice in District 6.  In 2020, District 6's voting-age population[4] was 14.5% Black, 12.4% Latinx, 13.5% Asian American, and 58.1% non-Hispanic white.  U.S. Representative Lucy McBath, a Black woman, won District 6's 2018 and 2020 general elections with 50.51% and 54.59% of the vote, respectively.  In both elections, U.S. Representative McBath was elected by a coalition of Black voters, Latinx voters, Asian American voters, and other voters of color, as well as some crossover support from non-Hispanic white voters.

84.    With S.B. 2EX, the General Assembly dismantled this district that enabled Black voters and other voters of color to elect their candidate of choice.

85.    The General Assembly fundamentally reshaped District 6 from a district with its core in densely populated urban and suburban communities in Cobb, Fulton, and DeKalb counties, to a district that now includes more sparsely-populated exurban and rural communities in Cherokee, Forsyth, and Dawson counties, which do not share the same interests as the prior district's core.  In doing so, District 6's

---

[4] The voting-age population is the population that is aged 18 and older.

boundaries split four counties (Cherokee, Cobb, Fulton, and Gwinnett) and the district's compactness was reduced, both visually and numerically.

86.     The Reock test and Polsby-Popper test are commonly used mathematical tests of compactness.  The Reock test computes the ratio of the area of the district to the area of the minimum enclosing circle for the district.  The Polsby-Popper test computes the ratio of the district area to the area of a circle with the same perimeter.  Both tests produce scores between 0 and 1, with a score of 0 representing the least compact district possible, and a score of 1 representing the most compact district possible.

87.     District 6 now has a 0.42 Reock score (down from 0.49) and a 0.20 Polsby-Popper score (down from 0.27).  District 6's Polsby-Popper compactness score is the second-lowest (meaning second-least compact) of any congressional district.

88.     The first figure below shows District 6's prior boundaries in red.  The northern boundary is coextensive with the Fulton County boundary.  The color shading shows the Black voting-age population ("BVAP") percentage within each precinct, with lower BVAP percentages in lighter, green colors and higher BVAP percentages in darker, blue colors.



89.     The second figure below shows District 6's new boundaries under S.B.

2EX in black.  A comparison of the above figure (prior boundaries) and below figure

(new boundaries) reflects the extent of the changes to the district's boundaries, that

the prior district boundaries were more compact than the new district boundaries,

and that the precincts removed in Cobb, Fulton, and DeKalb counties from the prior

boundaries have higher BVAP percentages than the precincts added to the new

boundaries in Dawson, Forsyth, and Cherokee counties.



90.    This complete redrawing of District 6 resulted in the addition of 360,684 new people within the district's boundaries and the consequent removal of 361,341 people.   Almost half of District 6's residents under the new boundaries previously resided in other districts.[5]

---

[5] District 6's overhaul was not required to comply with the U.S. Constitution's "one person, one vote" requirement or the Redistricting Committees' objective to achieve "exact equality of population (plus or minus one person)."   According to the 2020 U.S. Census, the existing district boundaries had a total population of 765,793, which was only 657 people more than the target size of 765,136 people for the new districts.   This was the smallest population deviation from the target district size of any of Georgia's congressional districts, and only a de minimis change to the

91.    The General Assembly's extensive changes to District 6's boundaries consistently worked to exclude Black voters and other voters of color from District 6 and replace them with non-Hispanic white voters.  Dawson County—added to District 6 from the prior District 9—has a miniscule 1.2% BVAP and overwhelming 89.5% non-Hispanic white voting-age population ("WVAP").  Forsyth County— added from prior Districts 7 and 9—has a 4.8% BVAP and 67.3% WVAP.  The General Assembly added more than half of Cherokee County's residents to District 6 from the prior District 11, with a 3.0% BVAP and 87.1% WVAP; meanwhile, the portion of Cherokee County that was not selected for inclusion in District 6 has a higher BVAP (8.2%) and lower WVAP (75.1%) than the portion that was included. A portion of Gwinnett County was also moved into District 6 from District 7; here, too, the area moved into District 6 has a significantly lower BVAP (13.4%) and higher WVAP (56.6%) than the rest of the county (32.3% BVAP, 27.6% WVAP).

92.    The changes to the district's boundaries resulted in net losses of 32,723 Black residents (55,416 removed, 22,693 added) and 29,286 Latinx residents (65,320 removed, 36,034 added), and a net gain of 60,545 non-Hispanic white residents (245,286 added, 184,741 removed).  The remade district has a 9.9% BVAP (a 31.7% decrease from 2020), 9.1% Latinx VAP (a 26.6% decrease from 2020),

---

district's boundaries was required.

12.3% Asian American VAP (an 8.9% decrease from 2020), and 66.6% WVAP (a 14.6% increase from 2020).

93.    As a result of these changes, Black voters and other voters of color will no longer be able to elect their candidate of choice in District 6.  Instead, District 6's elected representative will be a candidate preferred by non-Hispanic white voters.

94.    U.S. Representative McBath, the candidate preferred by Black voters and other voters of color in District 6, immediately declared upon the General Assembly's passage of S.B. 2EX that she will not even attempt reelection in District 6.  Instead, she will run against a white incumbent in her same party in another district.  *See* Greg Bluestein, *Targeted by Georgia GOP, McBath switching to safe Democratic district*, The Atlanta Journal-Constitution (Nov. 22, 2021), https://www.ajc.com/politics/politics-blog/targeted-by-georgia-gop-mcbath-switching-to-safe-democratic-district/OV227QR4VZCLVJNDP4ZBTHT2TY/.

95.    There is no corresponding gain in Black voters and other voters of colors' ability to elect preferred candidates in neighboring congressional districts to offset this loss of an opportunity to elect their preferred candidate in District 6.  To the contrary, the General Assembly transferred almost 90% of the Black voting-age population removed from District 6 into districts that already elected candidates preferred by Black voters and other voters of color: Districts 4, 5, and 7.

96.    This predominant use of race—radically altering District 6's boundaries to slash its population of Black voters and other voters of color and deny BIPOC voters an opportunity to elect their candidate of choice—was not narrowly tailored to comply with Section 2 of the VRA or any other compelling governmental interest.

### B.    Congressional District 13

97.    Race was also the predominant factor in drawing Congressional District 13.  The General Assembly subordinated traditional race-neutral districting principles, including compactness and respect for maintaining whole counties and communities of actual shared interest, to racial considerations.  District 13's boundaries were drawn to pack Black voters and other voters of color into the district, to eliminate opportunities for Black voters and other voters of color to influence surrounding districts.

98.    District 13's prior boundaries had a very high BVAP (62.6%) and BIPOC-VAP[6] (76.4%).  Under these prior boundaries, the candidate of choice of Black voters, U.S. Representative David Scott, easily won reelection in 2018 and 2020, with 76.2% and 77.4% of the general election vote, respectively.

---

[6] BIPOC-VAP is the share of the voting-age population that is BIPOC.

99.     District 13's new boundaries pack even more Black voters and other voters of color into the district, giving it a 66.7% BVAP and 81.2% BIPOC-VAP.

100.    District 13's new boundaries cross six counties in search of additional Black voters to pack into this district in areas west and south of Atlanta, weaving their way through southeast Cobb County, east Douglas County, south Fulton County, north Fayette County, south Clayton County, and north Henry County.

101.    The first figure below shows District 13's prior boundaries in red.  The prior boundaries encompassed all of Douglas County.



102.   The second figure below shows District 13's new boundaries under S.B. 2EX in black.  While the prior boundaries encompassed all of Douglas County, the new boundaries surgically excise the lowest-BVAP precincts from District 13's boundaries while retaining Douglas County's highest-BVAP precincts.  The new boundaries also remove lower-BVAP precincts from Fayette County that were included in District 13's prior boundaries.  The General Assembly replaced voters from these lower-BVAP Douglas and Fayette County precincts with voters from higher-BVAP precincts in Fulton and Clayton counties, thereby increasing District 13's BVAP percentage.  District 13's new boundaries encompass almost all high-BVAP precincts west and south of District 5, keeping these high-BVAP areas from reaching majority-white Districts 3 and 10, to the west, south, and east of District 13.



103. District 13 deviates from traditional redistricting principles as it contains no whole counties, and it splits more counties—six—than any other Georgia congressional district. In five of these six counties, the BVAP percentage of the area included in District 13 is significantly higher than the area excluded from District 13.[7]

---

[7] Clayton County is the exception, with District 13's portion maintaining a very high BVAP of 71.9%, only slightly lower than District 5's portion of Clayton County with a BVAP of 72.8%.

104.   In Cobb County, the area included within District 13's boundaries has a 44.6% BVAP, whereas the area excluded from District 13 has a 25.0% BVAP.  In Douglas County: the BVAP within District 13's boundaries is 57.6%, and the BVAP outside District 13's boundaries is 29.7%.  In Fayette County: a 31.3% BVAP within District 13, and a 9.5% BVAP outside District 13.  In Fulton County: a 88.3% BVAP within District 13, and a 35.9% BVAP outside District 13.  And in Henry County: a 57.1% BVAP within District 13, and a 44.6% BVAP outside District 13.

105.   In short, in each of these five instances where the General Assembly decided to include only a part of a county in District 13, it chose to divide the county along racial lines and include only the portion of the county with the higher concentration of Black voters.  The evident purpose of these divisions was to pack Black voters into District 13.  Splitting these counties to pack Black voters into District 13 fortifies the strength of non-Hispanic white voters' preferred candidates in neighboring districts.

106.   District 13 is not compact, with a 0.38 Reock score and 0.16 Polsby-Popper score.  District 13's Polsby-Popper compactness score is the lowest (meaning least compact) of any congressional district in the state.

107.   This predominant use of race—packing Black voters into District 13 in numbers substantially higher than necessary to elect candidates of choice, to reduce Black voting strength in other districts—was not narrowly tailored to comply with

Section 2 of the VRA or any other compelling governmental interest.  As noted above, the General Assembly packed more Black voters into a district that was already electing the candidate preferred by Black voters.  An effectiveness analysis—an examination that identifies whether and to what degree voting is racially polarized and analyzes based on votes for Black-preferred candidates and turnout percentages across elections what percentage BVAP is required for Black voters to usually elect candidates of choice—shows that District 13 is drawn with a BVAP that is well over 20% higher than necessary for Black voters to elect their candidates of choice.

### C.   Congressional District 14

108.   Race was the predominant factor in drawing Congressional District 14. The General Assembly subordinated traditional race-neutral districting principles, including compactness and respect for maintaining whole counties and communities of actual shared interest, to racial considerations.  Under S.B. 2EX, District 14's boundaries were extended into Cobb County, a core Metropolitan Atlanta county, to grab Black voters and other voters of color and submerge them into a predominately non-Hispanic white, rural district, which will continue to elect the candidate preferred by white voters.

109.   District 14 is a predominantly rural district in northwestern Georgia that includes ten entire counties: Catoosa, Chattooga, Dade, Floyd, Gordon, Murray,

Paulding, Polk, Walker, and Whitfield.  The prior District 14 also included heavily white Haralson County (4.8% BVAP, 90.2% WVAP) and a heavily white section of Pickens County (0.8% BVAP, 92.7% WVAP).

110.   The General Assembly redrew District 14 to remove Haralson County and a section of Pickens County.  Haralson County was transferred to District 3, while the section of Pickens County that was in District 14 was transferred to District 11.  Both of these districts are majority white, but not as heavily white as District 14.  The transfers of these two counties thus fortified white voter strength in Districts 3 and 11.

111.   The General Assembly replaced Haralson County and Pickens County (two heavily white areas) with a portion of southwestern Cobb County, which is largely comprised of Black communities and other communities of color.  The added area, containing the cities of Austell and Powder Springs, has a 46.5% BVAP and 60.9% BIPOC-VAP.

112.   The first figure below shows District 14's prior boundaries in red.  The prior boundaries encompassed all of Haralson County and part of Pickens County, each with minimal Black populations.



113.   The second figure below shows District 14's new boundaries under S.B. 2EX in black.  Shedding Haralson County and part of Pickens County, District 14's new boundaries reach into Cobb County to grab high-BVAP-percentage precincts in southwestern Cobb County, bypassing the lower-BVAP-percentage precincts in northern Cobb County.



114.   This high-BVAP area was selected for inclusion into District 14 instead of areas that were already in the prior district, areas which share more interests and commonalities with the rest of the district, and even more northern areas of Cobb County with a lower BVAP which are geographically closer to the district's core in northwest Georgia.[8]

---

[8] The portion of Cobb County not selected for inclusion within District 14's boundaries has a significantly lower BVAP (26%) than the portion that was included within District 14's boundaries (46.5%).

115.   In the 2020 general election, District 14's predominantly white voters overwhelmingly elected Marjorie Taylor Greene to represent them in Congress, with U.S. Representative Greene receiving 74.7% of the vote.   U.S. Representative Greene has repeatedly expressed racist sentiments that have been condemned by leaders of both major political parties.  She has stated that Black people are "held slaves to the Democratic Party," has compared Black Lives Matter activists to neo-Nazis, has denied that anti-Black racism exists in America, and has asserted that "[t]he most mistreated group of people in the United States today are white males." These are just a small sample of the vitriolic, racist statements made by the person who will now represent the Black residents of Cobb County in the United States Congress, as these Black communities have been cracked into a district whose communities  do  not  share  their  interests  and  with  whom  they  have  little commonality.

116.   As a result of the substitution of southwestern Cobb County for Haralson County and part of Pickens County, the District 14 BVAP increased from 10.2% to 14.3%, and the WVAP decreased from 75.9% to 71.3%.  Despite this significant increase in BVAP, Black voters and other voters of color will not be able to elect the candidate of their choice in District 14.

117.   This predominant use of race—changing District 14's boundaries to submerge Black voters and other voters of color into a district in which they cannot

influence the election results, and thereby diminishing overall Black voting strength across Georgia's congressional districts map—was not narrowly tailored to comply with Section 2 of the VRA or any other compelling governmental interest.

### CLAIM FOR RELIEF

**Count One: Racial Gerrymandering**
**S.B. 2EX's violations of the Fourteenth Amendment to the U.S. Constitution**
**U.S. Const. amend. XIV; 42 U.S.C. § 1983**

118.   The allegations contained in the preceding paragraphs are alleged as if fully set forth herein.

119.   The Fourteenth Amendment to the U.S. Constitution provides in relevant part: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV.

120.   Districts 6, 13, and 14 were drawn using race as the predominant factor in determining their boundaries.  The General Assembly subordinated traditional race-neutral districting principles, including compactness and respect for maintaining whole counties and communities of actual shared interest, to racial considerations.

121.   The predominant consideration of race in the drawing of Districts 6, 13, and 14 was not narrowly tailored to advance compliance with Section 2 of the VRA because Black voters and other voters of color were either packed into districts in numbers substantially higher than necessary to elect candidates of choice or cracked across multiple districts to prevent the formation of a majority-minority district or minority opportunity district.

122.   As a result, Districts 6, 13, and 14 each violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A.   Declare that Congressional Districts 6, 13, and 14 constitute racial gerrymanders in violation of the Fourteenth Amendment to the United States Constitution;

B.   Permanently enjoin the Defendants and their agents from holding elections in Districts 6, 13, and 14 as enacted in S.B. 2EX and any adjoining districts necessary to remedy the constitutional violations;

C.   Set a reasonable deadline for State authorities to adopt and enact a new constitutionally compliant redistricting plan for Georgia's congressional seats that remedies the unconstitutional racial

gerrymanders in Districts 6, 13, and 14 while still complying with Section 2 of the VRA;

D.    Order, if necessary, an interim redistricting plan for Georgia's congressional seats;

E.    Award Plaintiffs their costs, expenses, disbursements, and reasonable attorneys' fees incurred in bringing this suit, in accordance with 52 U.S.C. § 10310(e), 42 U.S.C. § 1988, and as otherwise allowed by law;

F.    Retain jurisdiction over this matter until all Defendants have complied with all orders and mandates of this Court;

G.    Grant such other and further relief as the Court may deem just and proper.

Dated this 7th day of January 2022.

Respectfully submitted,

*/s/ Jack Genberg*

Jack Genberg (Ga. Bar 144076)
Pichaya Poy Winichakul (Ga. Bar 246858)
SOUTHERN POVERTY LAW CENTER
P.O. Box 1287
Decatur, GA 30031-1287
Telephone: (404) 521-6700
Facsimile: (404) 221-5857
jack.genberg@splcenter.org
poy.winichakul@splcenter.org

Neil Steiner*
Sharon Turret*
DECHERT LLP

48

Three Bryant Park, 1095 Avenue of the
Americas
New York, NY 10036-6797
Telephone: (212) 698-3500
Facsimile: (212) 698-3599
neil.steiner@dechert.com
sharon.turret@dechert.com

Hartley M.K. West*
DECHERT LLP
One Bush Street, Suite 1600
San Francisco, CA 94104-4446
Telephone: (415) 262-4500
Facsimile: (415) 262-4555
hartley.west@dechert.com

Kyle DeCamp*
DECHERT LLP
633 West 5th Street, Suite 4900
Los Angeles, CA 90071-2032
Telephone: (213) 808-5700
Facsimile: (213) 808-5760
kyle.decamp@dechert.com

*Attorneys for Plaintiffs*
*Pro Hac Vice Forthcoming