IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| COMMON CAUSE, *et al.,*<br><br>　　*Plaintiffs,*<br>v.<br><br>BRAD RAFFENSPERGER,<br><br>　　*Defendant.* | CIVIL ACTION<br><br>FILE NO. 1:22-CV-00090-ELB-SCJ-SDG |

**DEFENDANT'S BRIEF IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

"Federal-court review of districting legislation represents a serious intrusion on the most vital of local functions." *Miller v. Johnson*, 515 U.S. 900, 915 (1995). This is because "reapportionment is primarily the duty and responsibility of the State." *Id*. Federal courts thus "have no commission to allocate political power and influence in the absence of a constitutional directive or legal standards to guide [them] in the exercise of such authority." *Rucho v. Common Cause*, 139 S. Ct. 2484, 2508 (2019).

When the Georgia General Assembly undertook the duty and responsibility of drafting districts for Congress following the 2020 Census, it followed the same process that it had used in prior redistricting cycles. The

resulting map split fewer counties than prior plans and increased Republican political performance. Plaintiffs dislike this plan, but their evidence does not support their sweeping attacks on the congressional map, nor could Plaintiffs' evidence support a ruling overturning those districts.

First, the organizational Plaintiffs in this case do not have standing because they have not presented sufficient evidence of their ability to stand in the shoes of their members to challenge the districts in the Amended Complaint, so they cannot bring the district-specific claims required in a redistricting case.

Second, Plaintiffs have not presented evidence of unconstitutional racial gerrymandering—in fact, their only evidence shows just the opposite. None their experts will opine that the Georgia General Assembly actually acted with racially discriminatory intent. The lack of evidence of intentional racial discrimination is fatal to Plaintiffs' sole claim.

This Court should grant summary judgment to Defendant and dismiss Plaintiffs' single count in its entirety.

## FACTUAL BACKGROUND

### I. Georgia's redistricting processes generally.

To create redistricting maps following the decennial Census, Georgia has followed a consistent process for more than two decades. First, it held town hall

meetings before redistricting maps were published in 2001, 2011, and 2021. Statement of Material Facts ("SMF") ¶ 1. Those meetings were all "listening sessions" that took community comment without legislators responding to questions. SMF ¶ 2. Second, redistricting has historically been conducted in special legislative sessions, with similar timelines for consideration of plans in 2001, 2011, and 2021. SMF ¶¶ 3-4. The 2021 redistricting process was "generally analogous" to the 2001 and 2011 cycle, and the 2001, 2011, and 2021 redistricting processes were procedurally and substantively similar to each other. SMF ¶¶ 5-6.

## II. Georgia's 2021 redistricting process specifically.

Following the delayed release of Census data in 2021,[1] the Georgia General Assembly began working on redistricting maps ahead of the November 2021 special session. SMF ¶ 8. Both chairs of the House and Senate committees with jurisdiction over redistricting sought to meet with all of their colleagues, both Republican and Democratic, to gain input on their areas of the state. SMF ¶ 9. For the first time in 2021, the General Assembly created a public comment portal to gather comments. SMF ¶ 10. After holding a committee education day

---

[1] The 2020 Census data showed that the increase in the percentage of Black voters in Georgia from 2010 to 2020 was slightly more than two percentage points statewide. SMF ¶ 7.

3

with stakeholder presentations, the committees adopted guidelines to govern the map-drawing process. SMF ¶ 11.

To prepare the congressional map, Gina Wright, the longtime director of the Joint Reapportionment Office, worked with a group to finalize a plan based on an earlier draft plan from Sen. Kennedy. SMF ¶ 12. Political considerations were key, including placing portions of Cobb County into District 14 to increase political performance. SMF ¶ 13. Although racial data was available, the chairs of each committee focused on past election data to evaluate the partisan impact of the new plans while drawing with awareness of Republican political performance. SMF ¶ 14.

When drawing redistricting plans, Ms. Wright never used tools that would color the draft maps by racial themes. SMF ¶ 15. The office included estimated political data at the Census block level, so political data was available across all layers of geography. SMF ¶ 16. The past election data was displayed on the screen with other data. SMF ¶ 17. The chairs evaluated the political performance of draft districts with political goals. SMF ¶ 18. The chairs and Ms. Wright also consulted with counsel about compliance with the Voting Rights Act. SMF ¶ 19.

After releasing draft maps, legislators received public comment at multiple committee meetings. SMF ¶ 20. Democratic leadership presented

alternative plans for Congress, state Senate, and state House that were considered in committee meetings.[2] SMF ¶ 21. After the plans were considered, they were passed by party-line votes in each committee before passing almost completely along party lines on the floor of the Senate and House. SMF ¶ 22.

The enacted congressional map resulted in five districts that elected Black- and Latino- preferred candidates while reducing split counties from the 2011 plan. SMF ¶¶ 25-26.

## ARGUMENT AND CITATION OF AUTHORITIES

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The moving party bears the initial burden but is not required to negate the opposing party's claims. Instead, the moving party may point out the absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Marion v. DeKalb Cty.*, 821 F. Supp. 685, 687 (N.D. Ga. 1993).

---

[2] Dr. Bagley agreed that he couldn't say the 2021 redistricting maps were an abuse of power by Republicans. SMF ¶ 23. Dr. Duchin likewise emphasized that she was not "criticizing Georgia for not doing enough" in her report. SMF ¶ 24.

### I. The organizational Plaintiffs lack standing to challenge the 2021 congressional redistricting plan.

A federal court is not "a forum for generalized grievances," and the requirement that plaintiffs have a personal stake in the claim they bring "ensures that courts exercise power that is judicial in nature." *Lance v. Coffman*, 549 U.S. 437, 439, 441 (2007). Federal courts uphold these limitations by insisting that a plaintiff satisfy the familiar three-part test for Article III standing: (1) injury in fact, (2) traceability, and (3) redressability. *Spokeo, Inc.* v. *Robins*, 578 U. S. 330, 338 (2016).

"Foremost among these requirements is injury in fact—a plaintiff's pleading and proof that he has suffered the 'invasion of a legally protected interest' that is 'concrete and particularized,' *i.e.*, 'which affect[s] the plaintiff in a personal and individual way.'" *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) (quoting *Lujan v. Defenders of Wildlife*, 504 U. S. 555, 560 & n.1 (1992)). In most cases, organizations may establish injury under Article III either by showing they had to divert resources, *Common Cause/Georgia v. Billups,* 554 F.3d 1340, 1350 (11th Cir. 2009), or by associational standing, *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009).

But in redistricting cases alleging vote dilution, organizations can only have associational standing, because an organization does not "reside" in any

6

particular district. "To the extent the plaintiffs' alleged harm is the dilution of their votes, **that injury is district specific.**" *Gill,* 138 S. Ct. at 1930 (emphasis added). In other words, "a plaintiff who alleges that he is the object of a racial gerrymander—a drawing of district lines on the basis of race—has standing to assert only that **his own** district has been so gerrymandered." *Id.* (emphasis added). Thus, an organization's diversion of resources will not suffice in this context. "A plaintiff who complains of gerrymandering, but who does not live in a gerrymandered district, 'assert[s] only a generalized grievance against governmental conduct of which he or she does not approve.'" *Id.* (quoting *United States v. Hays*, 515 U. S. 737, 745 (1995)).

In *Gill,* the Supreme Court noted that "[a]n individual voter in Wisconsin is placed in a single district. He votes for a single representative. The boundaries of the district, and the composition of its voters, determine whether and to what extent a particular voter is packed or cracked." *Id.* at 1930. The Court further held that this apparent disadvantage to the voter "results from the boundaries of the particular district in which he resides. And a plaintiff's remedy must be "limited to the inadequacy that produced [his] injury in fact." *Id.* at 1931 (quoting *Lewis v. Casey*, 518 U. S. 343, 357 (1996)). Finally, the Court concluded that "[i]n this case the remedy that is proper and sufficient

7

lies in **the revision of the boundaries of the individual's own district**." *Id.* at 1930 (emphasis added).

"[I]n response to a summary judgment motion, the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts." *Lujan*, 504 U.S. at 561 (quoting Fed. R. Civ. P. 56(e) (cleaned up)). "[A] petitioner must put forth specific facts ***supported by evidence***…" *Friends of the Earth, Inc., v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-181 (2000) (emphasis added). And to establish standing on an associational standing theory, "an organization must 'make specific allegations establishing that at least one identified member ha[s] suffered or [will] suffer harm.'" *Ga. Republican Party v. SEC*, 888 F. 3d 1198, 1203 (11th Cir. 2018), (quoting *Summers*, 555 U.S. at 498). This is because a Court "cannot accept an organization's 'self-descriptions of [its] membership… regardless of whether it is challenged.'" *Id.* (quoting *Summers*, 555 U.S. at 499).

In *Ga. Republican Party*, the plaintiff organization challenged Financial Industry Regulatory Authority (FINRA) Rule 2030, a regulation governing political contributions of FINRA members who solicited government officials for investment advisory services. The Court found the organization lacked standing because it was not a "placement agent" under the rule and, thus, was not directly regulated by Rule 2030. The Eleventh Circuit found that "the

8

Georgia Party has failed to allege that a specific member will be injured by the rule, and it certainly offers no evidence to support such an allegation." *Id*. at 1203. "Thus, the Party has failed to identify at least one member who has or will suffer harm from Rule 2030 as required to show injury in fact." *Id*.

The Common Cause and League of Women Voters (LWV) as organizational plaintiffs suffer the same evidentiary deficiency here. The representative for Common Cause was asked directly by counsel for Defendant in her deposition whether the organization would be willing to produce a list of its members living in the challenged districts and purportedly injured by the maps. SMF ¶ 27. But counsel for Common Cause instructed the witness not to answer on the basis of an associational privilege objection, and Common Cause never identified any individual in discovery or otherwise that might provide the requisite evidence to show the organization's associational standing. SMF ¶¶ 28-29.

Likewise, the LWV representative was directed by her counsel not to identify any members who were impacted by the 2021 redistricting plans and never identified any individuals in discovery. SMF ¶ 30. While they looked at ZIP codes and some addresses of members, LWV also could not state if it was sure if there were any current members in any of the challenged districts. SMF ¶ 31.

9

Because at this stage in the litigation this Court "cannot accept the organization's self-descriptions of its membership," *Ga. Republican Party*, 888 F. 3d, at 1203, Common Cause and LWV's refusal to provide evidence demonstrating its purported associational standing results in their failure to have established it altogether. This Court lacks jurisdiction over Common Cause and LWV as organizations because they cannot establish organizational standing in redistricting cases and have failed to demonstrate associational standing with admissible evidence. As a result, this Court should dismiss both organizations from this action.

## II. Plaintiffs have adduced no evidence that race predominated in the creation of congressional district map in 2021, so their racial gerrymandering claim must be dismissed or limited (Count I).

Plaintiffs claim in Count I that congressional districts 6, 13, and 14 are racial gerrymanders. [Doc. 32, ¶ 119-123]. In order to succeed:

> The plaintiff's burden is to show, either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district. To make this showing, a plaintiff must prove that the legislature subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, respect for political subdivisions or communities defined by actual shared interests, to racial considerations.

*Miller v. Johnson*, 515 U.S. 900, 916 (1995). Critically, this is not an *overall* analysis of the congressional plan. Rather, a racial gerrymandering claim "applies district-by-district. It does not apply to a State considered as an undifferentiated 'whole.'" *Ala. Legislative Black Caucus v. Alabama*, 575 U.S. 254, 262 (2015).

Now that discovery is closed, Plaintiffs have failed to adduce evidence that the *specific districts* in the plans they challenge are drawn as "race-based sorting of voters." *Cooper v. Harris*, 581 U.S. 285, 292 (2017). Plaintiffs could have made this showing "through 'direct evidence' of legislative intent, 'circumstantial evidence of a district's shape and demographics,' or a mix of both." *Id.* at 291. They have not done so here, so this Court need not reach the second question of whether the State had a compelling interest, such as compliance with the Voting Rights Act. *Id.* at 292.

First, there is no evidence of improper legislative intent. Despite taking the depositions of several legislators and Ms. Wright, Plaintiffs failed to adduce any evidence of a race-conscious sorting of voters in the districts they challenge. The evidence demonstrates that legislators were concerned about political performance, not race. SMF ¶ 32. Legislators had political data at all levels of geography and regularly evaluated the political performance of districts. SMF ¶ 33.

11

While Plaintiffs inquired about the districts named in their Complaint that they said were racial gerrymanders, they did not adduce any evidence that improper intent existed. Plaintiffs asked about Congressional District 6, Congressional District 13, and Congressional District 14. SMF ¶ 34. But in each case, Ms. Wright or the chairs testified either unequivocally about race-neutral or political goals for the creation of each district or did not testify as to any racial motivations. SMF ¶ 35.

Plaintiffs' own experts also refuse to opine that the General Assembly acted with racially discriminatory intent. Dr. Bagley found no "obvious discriminatory intent." SMF ¶ 36. While he analyzed the second, third, fourth, and fifth *Arlington Heights* factors,[3] he did not opine that discriminatory intent

---

[3] Inquiries into racial purpose in redistricting under the Fourteenth Amendment are governed by the standard in *Miller*: "[t]he plaintiff's burden is to show, either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." 515 U.S. at 916. While the Supreme Court has cited *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 266 (1977), in cases regarding the types of evidence that could be used in redistricting cases, it has never relied on *Arlington Heights* for the proper standard for evaluating intent claims in redistricting cases. *See, e.g., Cooper*, 581 U.S. at 319; *Shaw v. Reno*, 509 U.S. 630, 643 (1993); *accord S.C. State Conf. of the NAACP v. Alexander*, No. 3:21-cv-03302-MGL-TJH-RMG, 2023 U.S. Dist. LEXIS 4040, at *44 (D.S.C. Jan. 6, 2023) (three-judge panel)

was the driving factor of the legislature or that there was discriminatory intent in the legislative process of redistricting. SMF ¶ 37.

Dr. Bagley did not opine that the specific sequence of events leading to the adoption of the plans was discriminatory, but only that it would "lend credence" to a finding of discriminatory intent. SMF ¶ 38. He did not opine that the district lines were drawn to deny voters of color their equitable right to participate in the political process, although he believed a court could make that finding. SMF ¶ 39. He found no procedural or substantive departures in the 2021 redistricting process when compared to the 2001 and 2011 processes and agreed that the process was not rushed when compared to those prior cycles. SMF ¶ 40. And he only found one contemporary comment that concerned him, when Chair Rich stated in committee that there was not a "magic formula" for compliance with the Voting Rights Act. SMF ¶ 41.

Likewise, Dr. McCrary did not offer any opinion about discriminatory intent or about the design of the districts. SMF ¶ 42. Neither did Dr. Duchin, who only offered that she could provide "evidence that might be persuasive in terms of discerning intent" but that she could not "make hard and fast conclusions about what was in the hearts and minds of the legislators or . . . staff." SMF ¶ 43.

Second, Plaintiffs have provided no conclusive circumstantial evidence of racial gerrymandering because of a district's shape and demographics. In fact, Dr. Duchin's report[4] evaluates core retention and "racial swaps" only for Congressional Districts 6 and 14, not District 13. SMF ¶ 45. Dr. Duchin acknowledges that there were "many other considerations" in play besides core retention. SMF ¶ 46. She also acknowledged that racial population shifts are not conclusive evidence of racial predominance and that she could not say that the various metrics she reviewed showed racial predominance. SMF ¶ 47.

Further, while Dr. Duchin provides information about what she says are racial splits of counties in a variety of districts including Congressional Districts 2, 3, 4, 6, 8, 10, 13, and 14 and what she says are racial splits of precincts in Congressional Districts 4, 6, 10, and 11, she did not look at the political data behind those splits. SMF ¶¶ 48-49.

In the redistricting context, this Court must assume the good faith of the legislature and "must be sensitive to the complex interplay of forces that enter a legislature's redistricting calculus." *Miller*, 515 U.S. at 915-16. Plaintiffs have not provided sufficient evidence that "the legislature subordinated" any traditional principles to racial considerations. *Miller v. Johnson*, 515 U.S. 900,

---

[4] None of Plaintiffs' remaining experts provided opinions about district boundaries. SMF ¶ 44.

14

916 (1995). This is especially true because "States enjoy leeway to take race-based actions reasonably judged necessary under a proper interpretation of the VRA." *Cooper*, 581 U.S. at 306. At most, Plaintiffs can point to several examples where *political* splits of counties in specific districts also have a racial effect. Dr. Duchin's core retention analysis does not demonstrate that "compactness, contiguity, respect for political subdivisions or communities defined by actual shared interests" were subjected to racial considerations because she did not analyze those traditional principles. *Miller*, 515 U.S. at 919. As a result of this failure of evidence, Defendant is entitled to summary judgment on Plaintiffs' sole claim.

## CONCLUSION

After discovery, there remains no issue of any material fact in this case. The organizational Plaintiffs lack standing to challenge the congressional redistricting plan. But even if they or the remaining individual Plaintiffs have standing, Plaintiffs have not shown sufficient evidence of racial gerrymandering or discriminatory intent to overcome summary judgment on their constitutional claim. This Court should grant summary judgment to Defendant and dismiss this case.

Respectfully submitted this 27th day of March, 2023.

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
Elizabeth Vaughan
Assistant Attorney General
Georgia Bar No. 762715
**State Law Department**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/Bryan P. Tyson*
Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Frank B. Strickland
Georgia Bar No. 687600
fstrickland@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Diane Festin LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
Donald P. Boyle, Jr.
Georgia Bar No. 073519
dboyle@taylorenglish.com
Daniel H. Weigel
Georgia Bar No. 956419
dweigel@taylorenglish.com
**Taylor English Duma LLP**

1600 Parkwood Circle
Suite 200
Atlanta, Georgia 30339
(678) 336-7249

*Counsel for Defendant*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing Brief has been prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

*/s/Bryan P. Tyson*
Bryan P. Tyson
