IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| COMMON CAUSE, *et al.*, <br><br> *Plaintiffs*, <br> v. <br><br> BRAD RAFFENSPERGER, <br><br> *Defendant*. | CIVIL ACTION <br><br> FILE NO. 1:22-CV-00090-ELB-SCJ-SDG |

**DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

Defendant Brad Raffensperger, in his official capacity as Secretary of State of Georgia ("Defendant"), pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1 submits this Statement of Material Facts as to Which There is No Genuine Issue to be Tried.

1. The Georgia General Assembly held town hall meetings before redistricting maps were published in 2001, 2011, and 2021. Deposition of Joseph Bagley, Ph.D. [Doc. 82] (Bagley Dep.) 68:15-23, 73:25-74:9.

2. The town hall meetings in 2001, 2011, and 2021 were all "listening sessions" that took community comment without legislators responding to questions. Bagley Dep. 69:25-70:8, 73:25-74:9.

3. Redistricting has historically been conducted in special legislative sessions. Bagley Dep. Exs. 8-10.

4. The timeline for consideration of redistricting plans in 2001, 2011, and 2021 was similar. Bagley Dep. 101:7-101:12, 105:11-15, 138:18-24.

5. The 2021 redistricting process was "generally analogous" to the 2001 and 2011 cycle. Bagley Dep. 140:13-140:17.

6. The 2001, 2011, and 2021 redistricting processes were procedurally and substantively similar to each other. Bagley Dep. 86:25-87:19.

7. The 2020 Census data showed that the increase in the percentage of Black voters in Georgia from 2010 to 2020 was slightly more than two percentage points statewide. Deposition of Moon Duchin, Ph.D. [Doc. 88] (Duchin Dep.) 48:5-12.

8. Following the delayed release of Census data in 2021, the Georgia General Assembly began working on redistricting maps ahead of the November 2021 special session. Bagley Dep. Ex. 5.

9. Both chairs of the House and Senate committees with jurisdiction over redistricting sought to meet with all of their colleagues, both Republican and Democratic, to gain input on their areas of the state. Deposition of Gina Wright [Doc. 86] (Wright Dep.) 68:17-69:7.

10. For the first time in 2021, the General Assembly created a public comment portal to gather comments. Wright Dep. 252:20-253:4.

11. After holding a committee education day with stakeholder presentations, the committees adopted guidelines to govern the map-drawing process. Deposition of John F. Kennedy [Doc. 83] (Kennedy Dep.) 161:1-4; Deposition of Bonnie Rich [Doc. 85] (Rich Dep.) 214:19-215:7; Bagley Dep. 89:9-18.

12. To draw the congressional map, Ms. Wright worked with a group to finalize a plan based on an earlier draft plan from Sen. Kennedy. Wright Dep. 28:19-30:23.

13. Political considerations were key to drawing the congressional map, including placing portions of Cobb County into District 14 to increase political performance. Wright Dep. 111:16-112:10, 115:8-11, 115:17-24, 158:4-21.

14. Although racial data was available, the chairs of each committee focused on past election data to evaluate the partisan impact of the new plans while drawing with awareness of Republican political performance. Wright Dep. 55:25-56:7; 140:3-11; 140:17-19; 257:21-258:1; 258:2-14.

15. When drawing redistricting plans, Ms. Wright never used tools that would color the draft maps by racial themes. Wright Dep. 259:24-260:8.

16. The office included estimated election returns at the Census block level, so political data was available across all layers of geography. Wright Dep. 140:3-11.

17. The past election data was displayed on the screen with other data. Wright Dep. 140:17-19.

18. The chairs evaluated the political performance of draft districts with political goals. Wright Dep. 178:5-22, 191:25-193:3, 206:13-207:16.

19. The chairs and Ms. Wright also consulted with counsel about compliance with the Voting Rights Act. Wright Dep. 92:8-20.

20. After releasing draft maps, legislators received public comment at multiple committee meetings. Bagley Dep. 91:8-15, 93:8-10, 94:21-23, 95:14-96:6, 100:8-11, 111:24-112:1, 113:6-10, 115:4-11.

21. Democratic leadership presented alternative plans for Congress, state Senate, and state House that were considered in committee meetings. Bagley Dep. 109:15-110:1 (Congress), 112:18-22 (Congress), 93:2-13 (Senate), 93:21-94:5 (House).

22. After the plans were considered, they were passed by party-line votes in each committee before passing almost completely along party lines on the floor of the Senate and House. Bagley Dep. 93:14-20, 105:16-106:1, 113:22-114:4, 115:12-17, 117:2-4.

23. Dr. Bagley agreed that he couldn't say the 2021 redistricting maps were an abuse of power by Republicans. Bagley Dep. 63:25-64:3.

24. Dr. Duchin said that she was not "criticizing Georgia for not doing enough" in her report. Duchin Dep. 81:25-82:16.

25. The enacted congressional map resulted in five districts that elected Black- and Latino- preferred candidates Report of Moon Duchin, attached as Ex. A (Duchin Report), ¶¶ 4.1, 6.3.

26. The enacted congressional map reduced the number of split counties from the 2011 plan. Duchin Report, ¶¶ 4.1, 6.3.

27. The representative for Common Cause was asked directly by counsel for Defendant in her deposition whether the organization would be willing to produce a list of its members living in the challenged districts and purportedly injured by the maps. Deposition of Audra Dennis [Doc. 90] (Dennis Dep.) 77:19-79:23.

28. Counsel for Common Cause instructed the witness not to answer on the basis of an associational privilege objection. Dennis Dep. 77:19-79:23.

29. Common Cause never identified any individual in discovery or otherwise that might provide the requisite evidence to show the organization's associational standing. Dennis Dep. 77:19-79:23.

5

30. The League of Women Voters (LWV) representative was directed by her counsel not to identify any members who were impacted by the 2021 redistricting plans and never identified any individuals in discovery. Deposition of Julie Bolen [Doc. 91] (Bolen Dep.) 59:13-60:25.

31. While LWV looked at ZIP codes and some addresses of members, LWV could not state if it was sure if there were any current members in any of the challenged districts. Bolen Dep. 58:22-59:12.

32. The evidence from legislative depositions demonstrates that legislators were concerned about political performance, not race. Wright Dep. 55:25-56:7, 111:16-112:10, 115:8-11, 115:17-24, 140:3-11, 140:17-19, 158:4-21, 257:21-258:1, 258:2-14.

33. Legislators had political data at all levels of geography and regularly evaluated the political performance of districts as they were drawn. Wright Dep. 140:3-11, 178:5-22, 191:25-193:3, 206:13-207:16.

34. Plaintiffs asked about Congressional District 6 (Wright Dep. 111:16-125:25, 130:22-133:17; Kennedy Dep. 176:3-179:13), Congressional District 13 (Wright Dep. 168:22-171:7, 175:5-11; Kennedy Dep. 180:1-181:21), and Congressional District 14 (Wright Dep. 152:9-158:21; Kennedy Dep. 182:2-188:1; Rich Dep. 135:13-141:9, 142:3-16).

35. For Districts 6, 13, and 14, Ms. Wright or the chairs testified either unequivocally about race-neutral or political goals for the creation of each district or did not testify as to any racial motivations. *Id.*

36. Dr. Bagley found no "obvious discriminatory intent." Bagley Dep. 27:22-28:1.

37. While Dr. Bagley analyzed the second, third, fourth, and fifth *Arlington Heights* factors, he did not opine that discriminatory intent was the driving factor of the legislature or that there was discriminatory intent in the legislative process of redistricting. Bagley Report, p. 7; Bagley Dep. 27:22-28:1; 123:3-14.

38. Dr. Bagley did not opine that the specific sequence of events leading to the adoption of the plans was discriminatory, but only that it would "lend credence" to a finding of discriminatory intent. Bagley Dep. 122:14-123:1.

39. Dr. Bagley did not opine that the Georgia district lines were drawn to deny voters of color their equitable right to participate in the political process, although he believed a court could make that finding. Bagley Dep. 133:11-20.

40. Dr. Bagley found no procedural or substantive departures in the 2021 redistricting process when compared to the 2001 and 2011 processes and

7

agreed that the process was not rushed when compared to those prior cycles. Bagley Dep. 86:25-87:19, 138:18-24.

41. Dr. Bagley found one contemporary comment that concerned him, when Chair Rich stated in committee that there was not a "magic formula" for compliance with the Voting Rights Act. Bagley Dep. 110:2-111:23, 121:11-122:13.

42. Dr. McCrary did not offer any opinion about discriminatory intent or about the design of the districts. Deposition of Peyton McCrary [Doc. 84] (McCrary Dep.) 48:19-21.

43. Dr. Duchin did not offer any opinion about discriminatory intent, but rather offered that she could provide "evidence that might be persuasive in terms of discerning intent" but that she could not "make hard and fast conclusions about what was in the hearts and minds of the legislators or . . . staff." Duchin Dep. 34:11-22; *see also* Duchin Dep. 34:23-35:6.

44. None of Plaintiffs' experts besides Dr. Duchin provided opinions about district boundaries. McCrary Dep. 48:9-21; Bagley Dep. 28:19-29:6; Report of Benjamin Schneer, attached as Ex. B (Schneer Report), ¶¶ 5-8.

45. Dr. Duchin's report evaluates core retention and "racial swaps" only for Congressional Districts 6 and 14, not District 13. Duchin Report, ¶ 10.1.

46. Dr. Duchin acknowledges that there were "many other considerations" in play besides core retention. Duchin Dep. 171:22-172:7.

47. Dr. Duchin acknowledged that racial population shifts are not conclusive evidence of racial predominance and that she could not say that the various metrics she reviewed showed racial predominance. Duchin Dep. 180:18-23, 198:6-21 (Congress), 200:11-20 (Congress).

48. Dr. Duchin provides information about what she says are racial splits of counties in Congressional Districts 2, 3, 4, 6, 8, 10, 13, and 14 and what she says are racial splits of precincts in Congressional Districts 4, 6, 10, and 11. Duchin Report, ¶ 10.2.1; Duchin Dep. 167:5-15, 174:9-14, 186:17-23.

49. Dr. Duchin did not look at the political data behind those county splits on the congressional plan. Duchin Report, ¶ 10.2.1; Duchin Dep. 167:5-15, 174:9-14, 186:17-23.

Respectfully submitted this 27th day of March, 2023.

> Christopher M. Carr
> Attorney General
> Georgia Bar No. 112505
> Bryan K. Webb
> Deputy Attorney General
> Georgia Bar No. 743580
> Russell D. Willard

Senior Assistant Attorney General
Georgia Bar No. 760280
Elizabeth Vaughan
Assistant Attorney General
Georgia Bar No. 762715
**State Law Department**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/Bryan P. Tyson*
Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Frank B. Strickland
Georgia Bar No. 687600
fstrickland@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Diane Festin LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
Donald P. Boyle, Jr.
Georgia Bar No. 073519
dboyle@taylorenglish.com
Daniel H. Weigel
Georgia Bar No. 956419
dweigel@taylorenglish.com
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, Georgia 30339
(678) 336-7249

*Counsel for Defendant*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing Statement has been prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

*/s/Bryan P. Tyson*

Bryan P. Tyson
